Thank You counsel. Any further questions from panel? Judge Phillips? None from me, thank you. Judge Moritz? None here, thank you. Your time has expired, counsel. Case is submitted. Counselor excused. Thank you, Your Honor. Thank you, Your Honor. Thank you, Judge Hartz. Counsel for 19-4087 Craftsmith v. CC Design must now disconnect from the call. Arguing counsel in 19-4126 Dutcher v. Bold Films are on the call. Mr. Silverman, can you hear me? Yes, good morning, Your Honor. Mr. Hunt, can you hear me? Yes, I can. Good morning, Your Honors. Judge Hartz, the call is configured. Thank you. I will now call 19-4126 Dutcher v. Bold Films. Mr. Silverman, please proceed. May it please the court. The primary legal issue in this case is whether originality is a question of fact or law in a copyright case. The trial court erred when it adopted defendant's argument that originality is a question of law. The defendants below expressly argued to the court that the issue of originality or protectability or copyrightability, all terms that have the same meaning for the purposes of this case, asserted that that is a question of law and that the court could resolve disputes as to those questions. In doing so, the district court erred. We identified after the court indicated it was going to change from the Jacobson test to the Gates rubber abstraction filtration comparison test, identified 77 protected elements that were copied by the defendant's work. The specific document is in an affidavit from Richard Dutcher, a noted Utah filmmaker. It's at app 15302. That's where our client made a full length, fully produced motion picture that he self-produced. The district court's ruling essentially is that that work is entitled to no protection. In our brief at page 55, we indicated that the issue of whether originality is a question of law or fact had not been squarely decided by the court. I discovered yesterday, doing a little bit of validation of the citations we had previously submitted, that I had overlooked an important case that this court decided almost a full year ago, advanced recovery systems versus American agencies, 923, Fed Third, 819. The relevant portions are at 829 to 830. In the advanced recovery case, the work at issue was essentially two minor pieces of that collection correspondence. The court determined that the issue of whether that was sufficiently original was satisfied by testimony by an executive for the plaintiff that they were rendered with at least some creativity. We're dealing in this case with something that's on the other extreme, a fully produced motion picture. We've produced evidence that the copied elements are original. This is Judge Hart. It seems to me that if there's a copyright infringement here, then that means you essentially have a copyright in any movie about a stringer. The plots really aren't very similar, except insofar as they're about a stringer for TV and radio. Why is there a violation here, but your client did not violate the prior stringer movies that had come out? First, thank you, Your Honor, for the question. We, in our brief, outline the fact that the scene sequence and the sequence of events that the action, the characters in the dialogue that are copied not only are copied by Nightcrawler, but that the scene sequence occurs in the same order. The events happen in the exact same order for the exact same purpose. Independent of anything else in either motion picture, the murder scene in both films, which is the key scene in both movies, and what the first and second act of each movie leads into, and then all of the action that follows is directed from it, is essentially the same scene. The first 30 seconds and last 30 seconds of the following in Nightcrawler murder scenes can actually be played right next to each other. They're paced the same. The action is the same. The movement of the characters on the screen is the same. Most importantly, the consequence to the overall story is the same. It's that murder scene, the prior scene set up to the murder scene, and then everything that happens in both movies is related to the exact same action and conduct on the part of the protagonist, Stringer. So, pages 21 to 28 of our opening brief, we provide the minute and second references to both movies. If the court were to watch in its entirety the three unrelated obscure movies that the defendants relied on heavily below, we would, the court would see that the story, see that it would really drive home... Let me ask you about your assertion that the tell me if I'm mischaracterizing what happened. In Crawling, the murderers track down Eric, the Stringer, and then kill his friends and family. In Nightcrawler, the Stringer tracks down the murderers and stages a police shootout, which results in the death of the murderers. How are those similar? Well, it's similar because the act, what happens in Crawling is that the protagonist is somebody who is, you know, was a good person and commits a morally reprehensible act in holding a camera over a dying man as he's reaching up and breathing his last breath. Nightcrawler, it's the exact same primary action on the part of the Stringer. Now, they're similar because what Nightcrawler supposes is, what if Eric in Crawling was really a bad guy? What if he maximized the economic benefit of the footage he recorded? And he, so the tweak is the editing out of the license information. But it's similar because it's still the, it's the murder, it's the broadcast of the murder, and then it's the hunt afterward. And that's the similarity between the two movies. You know, the hunter and the hunted switch, but that doesn't make it any less similar. It doesn't, the decisions that were made. It seems to me it makes it a lot less similar. But let me, Judge Phillips, do you have any questions? No questions at this time. Thank you. Judge Morris. No questions at this time either. Let me follow up then. If there's a murder, there's going to be a hunt. That's something that's absolutely necessary. So if you have a murder, that's a stolen element. But surely, if we provided copyright protection for that sort of thing, there'd be 20 or 30 movies and everything else would be infringing the copyright of those movies. Your Honor, I would respectfully submit that is ultimately a decision for the jury to make. Jacobson indicates that summary judgment on substantial similarity is only permitted when a case has reached the outer limits of copyright protection. And I think, I think if you are focusing just on the similarities, you have the, there, the, take like, for example, the murder scene in Nightcrawler and Falling versus a multitude of murders that occur in, in the Stringer movie, the 1999 movie that was never released in the United States. It's not available in North America. Neither Dan Gilroy nor Richard Dutcher had ever heard or seen that film. There's no evidence that they have. The, the scenes are, the scenes are plotted and the sequence of events are the same. The, we have articulable similarities in the sequence of events. The order happens, the scenes happen in the same order and for the same purpose in the story. So you, only if you, only if you define similarity at such a high level of generality that it would encompass almost any movie about the same subject matter. In other words, that means you're protecting the idea of a murder witnessed by a Stringer. And that's not going to cut it, is it? Well, that's, but that's not the similarity. The similarity is that we have a movie, movies about a Stringer where the first, the, the introductory scenes and I'm, I'm just kind of going off of my brief at page 22 and I won't get into the details because I know you have access to the, to the written materials, but we walk through how the scenes themselves, the action, that everything that happens in Nightcrawler as far as the core story is, is copied. And so it's, you have a movie where the Stringer, where you're introduced to the Stringer by increasingly violent and graphic accident and crime scenes who sell their footage to only one person, that then leads to a murder scene that is plotted in the exact same manner where you have the, the Stringer recording from the, from the perimeter, moving in, in the same manner, recording the murders as they happen, recording the murderer fleeing in the same direction up to the upper left of the screen where the video is then sold for either 15 or 20,000. It's then maybe, I mean, there's, there's a, I'm not going to pronounce it correctly, but it seems unfair doctrine. And if you're saying that getting paid, the Stringer getting paid for filming the murder is a common feature, that's, that's just inherent in the notion of a Stringer capturing a murder on film. Is it not? It is not. And it's evidenced by the fact that there's nothing remotely close to this in any of the draft stories that Dan Gilroy worked on for, for 20 years. It's, it's the, the court's Warwick decision, the sequence of a, the combination and sequence of elements, whether generic or not. And that's what we have in this case is that we have the first two scenes of the movie, the first two acts in the movie that Nightcrawler is, you know, copies those scenes that are identified in our, in our briefing in the same order for the same purpose. So that's what makes the case different than the, than the arguments that the defendants have made below. With the court's permission, I have approximately a minute left. I'd like to reserve that for rebuttal. Yes, you may. Thank you. Mr. Hunt, you may proceed. Thank you, your honor. Jeff Hunt on behalf of the Apple leaves, both films, open road films and NBC universal. Good morning and may it please the court, the district court below engaged in exactly the type of filtration analysis. This court has not only endorsed, but required in copyright infringement cases like this in which courts and other circuits around the country routinely follow after it did that, that required filtration analysis. It correctly concluded that no reasonable jury could find that Nightcrawler was substantially similar to any protected elements and falling. And this court should affirm. I would like to pick up your honor where we left off about this notion of originality. We have never contested, the defendants have never contested that falling lacks the minimum degree of creativity to qualify for copyright protection. That's what originality is about in that context. What is at issue here is the scope of that protection. Whether the material that Mr. Dutcher claims was infringed is legally protectable. Not everything in a work that is issued a copyright registration is protectable. And that's what distinguishes the advanced recovery case that he's talking about. That was a case where the defendant said this form letter and agreement wasn't even subject to copyright protection because it didn't have the minimum degree of creativity required. We're not arguing that. Our argument is that the district court correctly followed the binding authority of this court in Sabant, Holmes, 2016, Blem, and Fisher, which require the district court to do exactly what the district court did below. And that is to filter out unprotected ideas, stock elements, scenes of fare, and try to identify the protected expression and then compare that to what the plaintiff is claiming was misappropriated. That's exactly what happened here. And what's controlling, Your Honor, in this, and I think Judge Hart's questions go to the heart of this, it's not counsel's characterization of the scenes or the plot that control or their experts, 77 alleged similarities, which if you look at that, it's nothing more than a laundry list of indiscriminate alleged similarities, many of which are not even similar. For example, a stringer holding a video camera, a stringer going under crime scene tape, those naturally follow from a movie about a protagonist that is a stringer. And at bottom, that is what this case is about from the plaintiff's perspective, is that they want a monopoly on that and copyright law does not grant it. If you looked at the murder scenes, I mean, the characterization or the description, I would say is strained in terms of trying to compare it to the murder scene in Nightcrawler. I mean, the murder scene that we have in Falling is in broad daylight. It's a bricklayer who is trying to murder him. And Eric is there by happenstance, the protagonist in Falling. He's on a pay phone. He's not there on purpose. And he has a gun. He has the ability to intervene and try to prevent what's happening. He doesn't do it. And as a result of that, he experiences a moral collapse because he's engaged in an occupation that constantly causes him to compromise his values and his moral beliefs. And from there, he goes down a path of destruction along with his wife, Davy, and she ends up getting killed and he ends up bludgeoning the gangster to death with a brick at the very end, shooting another one. And that is very different from the murder scene, the Granada Hills murder scene in Nightcrawler. And if you look at the scenes, you see that that's apparent. I mean, in the Nightcrawler film, you've got Lou who hears it on the police scanner and goes intentionally to the scene. And he starts filming. He essentially films an aftermath. He does not film the actual murders. You can hear the shots from outside, but you don't see them. And then he goes in and essentially films the murder scene. The viewfinder from the cameras is different. In Falling, it's always Eric with the recording point of view from the camera, and you don't have any of that cinematography choice made in Nightcrawler. And they also serve very different purposes. I mean, the whole purpose of the scene in the Granada Hills murder scene in Nightcrawler was to set up this, to allow Lou Bloom, the sociopath, who, by the way, is night and day different than the return visionary character in Falling, Eric, it allows him to set up that scene at the Chinese restaurant where he orchestrates this shootout that culminates in more deaths, allowing him to get more lucrative footage, and in the end results in the death of his partner, which he also orchestrates at the end. So he is profiting from this and ascending as a result of this scene. In Eric, it is just the opposite. It was unwanted. He didn't want to be there. He was there. He filmed the scene. And from that flow a series of consequences that lead him down a path toward death. Let me interrupt you, counsel. Judge Phillips, do you have any questions at this time? I do not. Judge Morris? Well, you haven't really discussed it yet, but I do have a question on the access. You do make an alternative, or you did make an alternative argument about summary judgment on access. Is that right? That's correct, Your Honor. And the court denied that, and you're challenging that on appeal or offering it as an alternative way to affirm. And I find that to be an interesting argument, but I noted that the district court didn't really analyze the facts that are in dispute here in denying your motion. I wondered how you think we should address that, or how does that play into the issue? Sure. And thank you, Your Honor. First of all, I would say that there's no to reach the access issue. We just certainly raised it as an alternative grounds for affirmance. We believe it is equally strong grounds as to affirmance on substantial similarity. But the district court's summary judgment below that's been appealed from dealt solely with substantial similarity. It did not deal with access. So we simply preserve the issue. It's preserved, and the court can affirm on that basis, but it does not need to reach that issue, which I think in the case here where you have a judge, a district judge that was well within the lines in terms of separating ideas and stock elements that flow from those ideas to protect his expression, that it is consistent with all of the precedent of this circuit, the line that he draws, and it is a question for the court. If it wasn't a question for the court, you'd be throwing unprotected material and protected elements to the jury and say, you sort it out. Here's the filtration analysis, and that is not the law. It's certainly not the law in the Tenth Circuit. The court plays an important gatekeeping role on summary judgment to ferret out the unprotected material, which in this case is all the stock elements that counsel recited that flow directly from the fact that these two protagonists are engaged in the occupation of the stringer. And once you filter that out and you look at the protected expression, which in this case, we agree that the brick scene, the murder scene and following, that is protected expression. That's sufficiently particular and concrete to be protected expression. But there's nothing like that in Nightcrawler. It is not substantially similar, and the district court correctly concluded that it was not. And so there's this competing policy interest in the Copyright Act between the interest of the author in controlling and exploiting their creative work, but there's also an interest in the free flow of information and ideas that serve as the creative wellspring for other artists so that they can create works without fear of facing a unmeritorious infringement claim that is based on unprotected material. And we submit that the district court got it right. It correctly analyzed the factors that this court has articulated in all the cases, including the Jacobson case, and reached the correct conclusion that the level of generality that Mr. Dutcher was claiming protection for was too high to constitute a protected element, and that what was left was not substantially similar to any material in Nightcrawler. And I'll stop there. Are there any further questions? Judge Phillips? None here. Thank you. Judge Morris? None here. Thank you, counsel. Thank you, Your Honor. Mr. Silberman, I believe you have another minute or so. Yes. I'll try not to speak too quickly. What the defense counsel argued are their version of the facts, and it's up to the jury to weigh disputes over the facts. The admission that the defendants believe that there's a gatekeeping role in determining whether or not something is a protected element or not kind of goes to the heart of the problems of the district's court order in light of the FICE decision, in light of this court's enterprise management versus Warwick decision. The elements that we've talked about, the sequence of events, they occur in the same order in both works for the same purpose. And so we would, that's the point that I would make on that. The other problem that, with the defendant's argument, is that they're essentially ignoring or turning on its head FICE's admonition that originality does not mean novelty. The other three works that the trial court relied on, because what the trial court determined was that there was striking similarity between the two works, but based on the submission of the defendants, based on the fact that there was a lack of novelty with these other works, he was going to grant summary judgment. That was a legal error. With that legal error corrected, the case should be remanded. Those three movies should not be part of the case on remand. Thank you, counsel. I understand I'm out of time. Yes, you are. Thank you, counsel. Case is admitted. Counsel are excused. Any announcements? No. Thank you, judges, counsel. Thank you, your honor. Very good. Court is adjourned. Thank you. Thank you. Court is in recess. Subject to call. This call be now discontinued.